No. 14-3876

*In the*

# United States Court of Appeals

*for the*

# Eighth Circuit

Jesse Ventura, a/k/a James G. Janos,

Plaintiff-Appellee,

vs.

Taya Kyle, as Executor of the Estate of Chris Kyle,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MINNESOTA
Civ. No. 12-cv-472 (RHK/JJK) – District Judge Richard H. Kyle

**APPELLEE'S BRIEF**

**HENSON & EFRON, P.A.**
David Bradley Olsen (Minn. #197944)
Court J. Anderson (Minn. #331570)
John N. Bisanz, Jr. (Minn. #0389098)
Benjamin J. Hamborg (Minn. #0395401)
220 South Sixth Street, Suite 1800
Minneapolis, Minnesota 55402-4503
Telephone: 612-339-2500
Facsimile: 612-339-6364
*Attorneys for Plaintiff-Appellee*
*Jesse Ventura a/k/a James G. Janos*

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE.................................................................4

    A.    THE 2006 REUNION ............................................................4

    B.    KYLE'S DEFAMATORY STORY ...................................6

    C.    KYLE'S STORY IS A COMPLETE FABRICATION .......................8

        1.    Ventura and His Witnesses:  There Was No Incident.................8

        2.    Kyle and His Witnesses:  No Credible Rebuttal ........................9

    D.    DAMAGE TO REPUTATION ...................................18

    E.    UNJUST ENRICHMENT ...................................21

    F.    INSURANCE ...................................26

    G.    FAILURE TO PRESERVE ARGUMENTS FOR APPEAL.............27

SUMMARY OF THE ARGUMENT ...................................29

STANDARD OF REVIEW ...................................31

ARGUMENT ...................................34

    I.  DEFAMATION...................................34

    A.    The Court Need Not Decide Whether the Constitution
Requires Proving Falsity by a Heightened Standard .........................34

    B.    The District Court's Jury Instructions Regarding
Defamation Do Not Constitute an Abuse of Discretion ....................37

        1.    The District Court Correctly Instructed the Jury to
View Kyle's Statements Within the Context of the
"Story" as a Whole...................................37

        2.    The District Court Did Not Abuse Its Discretion by
Refusing to Instruct the Jury on the Definition of
"Serious Doubts"...................................43

    C.    The Evidence Supports the Jury's Verdict...................................46

        1.    The Evidence Clearly and Convincingly Establishes
that Kyle's Story Was False...................................46

        2.    The Evidence Clearly and Convincingly Establishes
that Kyle Acted with Actual Malice...................................50

    II.  UNJUST ENRICHMENT...................................52

    A.    The Estate Waived Its State Law and First Amendment Arguments
by Failing to Timely Raise Them in the District Court ....................52

    B.    Neither Minnesota Law Nor the First Amendment Bar a Defamation
Plaintiff from Seeking Damages for Unjust Enrichment....................53

        1.    Ventura's Unjust Enrichment Claim Is Allowed Under
Minnesota Law...................................53

Appellate Case: 14-3876    Page: 2    Date Filed: 04/27/2015 Entry ID: 4269150

     2.     Ventura's Unjust Enrichment Claim Is Not Barred by
the First Amendment .................................................................57

    C.   The District Court's Findings of Fact on Ventura's
Unjust Enrichment Claim Are Not Clearly Erroneous ......................59

**III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
BY ALLOWING CROSS-EXAMINATION REGARDING
EVIDENCE OF INSURANCE** ..................................................................63

**CONCLUSION** ...........................................................................................68

\*\*\*\*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS** ..............................................................................70

**CERTIFICATE OF SERVICE AND FILING** ..................................................71

Appellate Case: 14-3876    Page: 3    Date Filed: 04/27/2015 Entry ID: 4269150

# TABLE OF AUTHORITIES

## Cases

*Acton Const. Co. v. State*, 383 N.W.2d 416 (Minn. Ct. App. 1986) ......................54

*ACTONet, Ltd. v. Allou Health & Beauty Care*, 219 F.3d 836
(8th Cir. 2000).........................................................................................................64

*Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014)......................................41

*Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864
(8th Cir. 2005).........................................................................................................41

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)......................32

*Brokers' Choice of Am. v. NBC Universal, Inc.*, 757 F.3d 1125
(10th Cir. 2014).......................................................................................................42

*Brown v. Sandals Resorts Int'l*, 284 F.3d 949 (8th Cir. 2002) .................... 2, 33, 37

*Burroughs v. Mackie Moving Sys. Corp.*, 690 F.3d 1047
(8th Cir. 2012)................................................................................................... 64, 68

*Burton v. United States*, 196 U.S. 283 (1905) ........................................................34

*Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560
(8th Cir. 2001)................................................................................................... 2, 35, 44

*Camreta v. Greene*, 131 S.Ct. 2020 (2011) ............................................................34

*Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894
(8th Cir. 2006).........................................................................................................52

*Carroll v. Pratt*, 76 N.W.2d 693 (Minn. 1956) .....................................................59

*Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001).....3, 59

*Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492 (8th Cir. 1998).........................37

iii

*Dendall v. Daily News Pub. Co.*, 716 F.3d 82 (3rd Cir. 2013)............... 2, 32, 46, 47

*DiBella v. Hopkins*, 403 F. 3d 102 (2d Cir. 2005).....................................................35

*Dunham v. Opperman*, No. A06-750, 2007 WL 1191599
(Minn. Ct. App. April 24, 2007) ...............................................................................39

*Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997).......................2, 33

*Families Achieving Independence & Respect v. Neb. Dept. Soc. Serv.*,
111 F.3d 1408 (8th Cir. 1997) ......................................................... 2, 32, 33, 46, 47

*Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986)..........................53

*Galante v. Oz, Inc.*, 379 N.W.2d 723 (Minn. Ct. App. 1986) ...........................3, 54

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)........................................ 3, 43, 58

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969), *cert. denied*,
396 U.S. 1049 (1970)................................................................................................36

*Hannah v. City of Overland, Mo.*, 795 F.2d 1385 (8th Cir. 1986) .........................66

*Harman v. Heartand Food Co.*, 614 N.W.2d 236 (Minn. Ct. App. 2000).............39

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657
(1989) ........................................................................... 1, 34, 35, 44, 50

*Higgin v. Hicks Co.*, 756 F.2d 681 (8th Cir. 1985)..................................................65

*Jackson v. Reiling*, 249 N.W.2d 896 (Minn. 1977) ................................................62

*Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996)......................................................4, 67

*Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845
(8th Cir. 2014)................................................................................................... 54, 56

*Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198 (1st Cir. 2006) ..............................32

*Masson v. New Yorker Magazine*, 501 U.S. 496 (1991).................................... 41, 45

iv

*McKee v. Laurian*, 825 N.W.2d 725 (Minn. 2013) ...................................41

*McKnight ex rel. Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396
(8th Cir. 1994).........................................................................................52

*Michaelis v. CBS Inc.*, 119 F.3d 697 (8th Cir. 1997) ..............................41

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)............................43

*Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854 (8th Cir. 2006) ..............52

*O'Brien v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 862
(8th Cir. 2014)................................................................................ 34, 36

*Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291 (8th Cir. 1982).................4, 65

*Price v. Viking Penguin*, 881 F.2d 1426 (8th Cir. 1989) .........................41

*Prinzing v. Schwab*, No. A05-398, 2006 WL 538926 (Minn. Ct. App.
Mar. 7, 2006).........................................................................................51

*Rattray v. City of Nat'l City*, 36 F.3d 1480 (9th Cir. 1994)..................1, 35

*Ruzicka Elec. & Sons, Inc. v. Int'l Bhd. of Elec. Workers, Local 1, AFL-CIO*,
427 F.3d 511 (8th Cir. 2005) .................................................................59

*Ryther v. KARE 11,* 108 F.3d 832 (8th Cir. 1997)...................................37

*Sanders v. Hobbs*, 773 F.3d 186 (8th Cir. 2014) ....................................46

*Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297
(Minn. Ct. App. 2001)..........................................................................2, 39

*ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302
(Minn. 1996) ........................................................................................3, 53

*Shaw Group, Inc. v. Marcum*, 516 F.3d 1061 (8th Cir. 2008)..................... 4, 33, 63

*Speer v. City of Wynne, Ark.*, 276 F.3d 980 (8th Cir. 2002)....................60

Appellate Case: 14-3876    Page: 6    Date Filed: 04/27/2015 Entry ID: 4269150

*St. Amant v. Thompson*, 390 U.S. 727 (1968) .......................................... 2, 41, 50, 51

*State v. Melchert-Dinkel*, 844 N.W.2d 13 (Minn. 2014) ..........................................58

*Stepnes v. Ritschel*, 663 F.3d 952 (8th Cir. 2011) ....................................................41

*Stock v. Heiner*, 696 F.Supp. 1253 (D. Minn. 1988) ................................................57

*Stokes v. CBS Inc.*, 25 F. Supp. 2d 992 (D. Minn. 1998) ..........................................50

*U.S. ex rel. Zissler v. Regents of the Univ. Minn.*, 992 F.Supp. 1097
(D. Minn. 1998) ........................................................................................................55

*United States v. Alvarez*, 132 S.Ct. 2537 (2012) .....................................................58

*United States v. Bame*, 721 F.3d 1025 (8th Cir. 2013) ......................................56, 57

*United States v. Piatt*, 679 F.2d 1228 (8th Cir. 1982) ..............................................44

*United States v. White*, 794 F.2d 367 (8th Cir. 1986) ..............................................45

*Wagner v. Gallup, Inc.*, 989 F. Supp. 2d 782 (D. Minn. 2003) ...............................56

*Wallace v. Conagra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014) ........................1, 34

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397
(S.D.N.Y. 2003) .......................................................................................................67

*West v. Media Gen. Operations, Inc.*, 120 Fed. Appx. 601 (6th Cir. 2005)............42

*Whiteley v. OKC Corp.*, 719 F.2d 1051 (10th Cir. 1983) .........................................67

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F. 3d 1032
(8th Cir. 2011) ...............................................................................45, 56, 60, 62

Appellate Case: 14-3876     Page: 7     Date Filed: 04/27/2015 Entry ID: 4269150

## Other Authorities

471 Charles A. Wright & Kenneth W. Graham, Federal Practice & Procedure: Evidence § 5368 (1st ed. 1980) ..........................................67

Erick J. Konopka, *Hey, That's Cheating! The Misuse of the Irreparable Injury Rule as a Shortcut to Preclude Unjust-Enrichment Claims*, 114 Colum. L. Rev. 2045 (2014) ..............................................................57

Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems §5.5.2, at 5-83-84 (4th ed. 2010) ..........................................51

## Rules

Fed. R. Civ. P. 49 ....................................................................................38

Fed. R. Civ. P. 50(a) ...............................................................................52

Fed. R. Civ. P. 50(b) ...............................................................................52

Fed. R. Civ. P. 52(a) ...............................................................................33

Fed. R. Civ. P. 52(a)(6) ...........................................................................60

Fed. R. Civ. P. 52(b) ......................................................................... 52, 53

Fed. R. Civ. P. 61 ....................................................................................33

Fed. R. Evid. 411 ............................................................... 3, 31, 64, 65

Appellate Case: 14-3876     Page: 8     Date Filed: 04/27/2015 Entry ID: 4269150

## STATEMENT OF THE ISSUES

I.     The doctrine of constitutional avoidance counsels courts not to give unnecessary answers to constitutional questions.  The Estate asks this Court to rule that the First Amendment requires public figure defamation plaintiffs to prove falsity by a heightened clear-and-convincing evidence standard, rather than the traditional preponderance standard.  Given that the district court found Ventura proved Kyle's story false by clear-and-convincing evidence, is it necessary for the Court to address the constitutional issue?

Apposite Authority:

- *Wallace v. Conagra Foods, Inc*., 747 F.3d 1025 (8th Cir. 2014)

- *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989)

- *Rattray v. City of Nat'l City*, 36 F.3d 1480 (9th Cir. 1994)

II.     Review of the trial court's jury instructions is limited to whether, taken as a whole, they fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury.  The jury was instructed to consider Kyle's statements in context to determine if Ventura proved material falsity and defamatory meaning by a preponderance of the evidence, and actual malice by clear-and-convincing evidence.  Actual malice was defined to include knowledge of falsity or reckless disregard for the truth.  To find reckless disregard, the jury

1

was instructed that it must conclude Kyle entertained "serious doubts" as to the truth of his statements. Did the district court abuse its discretion?

Apposite Authority:

- *Brown v. Sandals Resorts Int'l*, 284 F.3d 949 (8th Cir. 2002)

- *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297 (Minn. Ct. App. 2001)

- *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560 (8th Cir. 2001)

III.     Appellate courts view the evidence in the light most favorable to a jury's verdict and will not set it aside unless there is a complete absence of probative facts to support it. Based on eye-witness testimony, photographs, and other documents, the jury found that Kyle's firsthand account of the alleged incident was materially false and was published with actual malice. Are there any probative facts in the record to support the jury's verdict?

Apposite Authority:

- *Families Achieving Independence & Respect v. Neb. Dept. Soc. Serv.*, 111 F.3d 1408 (8th Cir. 1997)

- *Dendall v. Daily News Pub. Co.*, 716 F.3d 82 (3rd Cir. 2013)

- *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)

- *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997)

Appellate Case: 14-3876     Page: 10     Date Filed: 04/27/2015 Entry ID: 4269150

IV.     Despite numerous opportunities, including two motions for summary judgment and a Rule 50(a) motion for JMOL, the Estate never argued before entry of judgment that Ventura's unjust enrichment claim is barred by the existence of an adequate legal remedy or the First Amendment.  The district court accordingly ruled that the Estate had waived its arguments and that, even if it had not, the arguments failed as a matter of law and the unjust enrichment award was supported by substantial evidence.  Having waived its arguments below, can the Estate raise them on appeal and, if so, did the district court clearly err by ruling that the unjust enrichment claim is not barred and that sufficient evidence supports the award?

Apposite Authority:

- *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc*., 544 N.W.2d 302 (Minn. 1996)

- *Galante v. Oz, Inc*., 379 N.W.2d 723 (Minn. Ct. App. 1986)

- *Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974)

- *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001)

V.     Under Fed. R. Evid. 411, evidence that a person is insured against liability is admissible *unless* offered to prove negligence or wrongful conduct.  Although the Estate did not object to the admission of Kyle's Publishing Agreement—which identifies Kyle as an additional insured on the publisher's insurance policy—or to references to the insurance policy made during closing

3

argument, it now asks for a new trial on the ground that cross-examination regarding the existence of the insurance policy should not have been permitted. Did the Estate waive its argument and, if not, did the district court abuse its discretion and substantially prejudice the Estate by admitting limited evidence of the existence of insurance to show bias and to rebut the Estate's efforts to "poor mouth"?

> Apposite Authority:

- *Shaw Group, Inc. v. Marcum*, 516 F.3d 1061 (8th Cir. 2008)

- *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291 (8th Cir. 1982)

- *Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996)

## STATEMENT OF THE CASE[1]

### A.  THE 2006 REUNION

James Janos, n/k/a Jesse Ventura,[2] enlisted in the Navy in 1969, graduated with BUD/s class 58, and was assigned to UDT team 12, where he served four years as a frogman and another two years as a reserve with SEAL Team One.[3]

---

[1] The entire trial transcript is of record at ECF 426 through 441.  Transcript citations in this brief are to Appellant's Appendix ("APP") and Appellee's Appendix ("AA").  The district court includes a concise summary of the facts in its Orders contained in Appellant's Addendum ("ADD") at ADD-0001-40.

[2] AA-0374-75.

[3] AA-0289-96.

4

On Thursday, October 12, 2006, then 55-year-old former Governor Jesse Ventura flew to California to attend a graduation ceremony for BUD/s Class 258.[4] He picked up his rental car in San Diego at 7:39 p.m.,[5] and sometime after 8:00 p.m. walked onto the patio of McP's Irish Pub in Coronado.[6] Friends Bill Dewitt,[7] his wife Charlene,[8] and Rob Leonard[9] were already there.[10] Also on the patio was a group of younger SEALs who were there to attend a wake honoring Mikey Monsoor, a SEAL Medal of Honor winner killed in Iraq.[11]

Around 11:00 p.m. Ventura and his friends left McP's.[12] He went straight back to his hotel.[13] Nothing out of the ordinary happened before he left.[14]

---

[4] AA-0232-33, 0313-18, 0710.

[5] AA-0314-15, 0711-14.

[6] AA-0313-19, 0329-30.

[7] AA-0187-88.

[8] AA-0233, 0235-36.

[9] AA-0251-57.

[10] AA-0189-91, 0256-57, 0328-29; APP-0909.

[11] AA-0192, 0200-06, 0239-45, 0258-59; APP-0985-86.

[12] AA-0205-06, 0244-45, 0267-68, 0337-38.

[13] AA-0337-38.

[14] AA-0330, 0331-38; APP-1076.

Appellate Case: 14-3876    Page: 13    Date Filed: 04/27/2015 Entry ID: 4269150

On Friday, October 13, 2006, Ventura and other Class 58 alumni attended Class 258's graduation.[15] Ventura sat in the front row and was introduced as an honored guest.[16] There was no talk of any incidents that happened at McP's, Ventura did not act any differently than he had the night before, and photographs taken during the ceremony show no signs that he had been physically assaulted.[17]

On Saturday, October 14, 2006, Ventura and the Class 58 alumni went to a picnic.[18] On Sunday, he flew home and went on with his life.[19]

**B.    KYLE'S DEFAMATORY STORY**

On January 3, 2012, Chris Kyle released *American Sniper—The Autobiography of the Most Lethal Sniper in U.S. Military History*.[20] In it is a story titled *Punching out Scruff Face*, told as a true, firsthand account of an incident that happened at McP's on October 12, 2006.[21] Kyle's story describes "Scruff" as an

---

[15] AA-0206-07, 0245, 0268-69, 0341.

[16] AA-0206-08, 0245, 0341-42.

[17] AA-0208-15, 0246-47, 0269-71, 0342-44; AA-0866-68, 0870, 0877-82 (10-13-06 Photographs).

[18] AA-0215-22, 0247-48, 0272-73, 0344-46; AA-0865, 0869, 0871-72, 0883-88 (10-14-06 Photographs).

[19] AA-0346; APP-1011.

[20] AA-0153, 0722-26.

[21] ADD-0054-57; AA-0152, 0740-43.

Appellate Case: 14-3876    Page: 14    Date Filed: 04/27/2015 Entry ID: 4269150

older, celebrity former UTD/SEAL from the Vietnam era who showed up at Monsoor's wake and, in the presence of his family and SEAL teammates, defiantly proclaimed that SEALs "deserve to lose a few." Kyle wrote that he responded by punching "Scruff" in the face and knocking him to the ground in a scene where "Tables flew. Stuff Happened." The story concludes with "Scruff" showing up at the BUD/s graduation the next day with a black eye and being ridiculed.

"Scruff'" was described with sufficient detail for readers to identify him as Ventura.[22] Just a day after the book's release, Kyle publicly confirmed it.[23]

Kyle has told multiple versions of his story, all of them different.[24] In the published version,[25] he chose to omit details from prior tellings that could be easily proved false, such as: (i) Ventura hit his head on the ground and did not get back up; (ii) Ventura had a friend with him when it happened; (iii) Ventura appeared on TV with a black eye; and (iv) the police were there.[26] Kyle also included new details in the final version, like Ventura supposedly taking the first swing.[27]

_____

[22] AA-0356-57, 0722-26.

[23] ADD-0058-68.

[24] APP-2466-77; AA-0111-51, 0588-613, 0731-39.

[25] AA-0130, 0740-43.

[26] AA-0006-13, 0110-23, 0152, 0740-43, 0838; APP-0541-43, 2466-69, 2475-77.

[27] AA-0014-17, 0157-58, 0163, 0722-26, 0744-50.

7

### C. KYLE'S STORY IS A COMPLETE FABRICATION

#### 1. Ventura and His Witnesses:  There Was No Incident.

Ventura was never involved in a verbal or physical confrontation with anyone at McP's in October 2006, and did not say the things Kyle attributed to him.[28]  The entire story, with the exception of Ventura having been at McP's and the graduation ceremony, is a complete fabrication.[29]

The DeWitts and Leonard had an unobstructed view of the McP's patio, adjacent parking lot, sidewalks, and streets.[30]  The patio was small, estimated to be just 50-60 feet by 30 feet.[31]

Charlene DeWitt was on the patio all night,[32] watching Ventura and listening to him intently;[33] in fact, she found Ventura so interesting that she changed seats when he arrived in order to hear his conversations.[34]  But she never heard Ventura say the things in Kyle's book, and she testified that it is "not possible" there was an

---

[28] AA-0358-61, 0905.

[29] AA-0338-40; APP-1026 ("The only thing accurately portrayed of me was that I was there"); AA-0380 ("I'm claiming the story is a fabricated lie.").

[30] AA-0318-27, 0704-09, 0715-21.

[31] AA-0084-85; APP-0837.

[32] AA-0233-35.

[33] AA-0237-38.

[34] AA-0238.

Appellate Case: 14-3876     Page: 16     Date Filed: 04/27/2015 Entry ID: 4269150

altercation and she "missed it."[35]  Bill DeWitt and Rob Leonard did not witness or

notice any type of a verbal or physical dispute either, and they did not hear Ventura

say any of the things Kyle wrote.[36]

Neither DeWitt and Leonard, nor Ventura's wife and son, believe Ventura

would ever say "SEALs deserve to lose a few," or would ever wish harm on

Americans who wear the uniform.[37]  In fact, the Estate produced no evidence that

Ventura has ever said anything derogatory about the troops that serve, as

contrasted with his well-known opposition to government policy.[38]

### 2. Kyle and His Witnesses:  No Credible Rebuttal.

Kyle is an admitted liar.[39]  He lied to his co-author, DeFelice, about many

things in the book.[40]  And, while on active duty in the military, he lied to military

doctors and police to avoid the consequences of an alcohol-related incident, and

---

[35] AA-0238-46, 0249; AA-0704 (DeWitt's view was same as that of lady's shown wearing white hat); AA-0707 (Charlene DeWitt seated where lady wearing red shirt is shown); APP-0809-11.

[36] AA-0194-206, 0229-31, 0260-68, 0275-77.

[37] AA-0223-24, 0274, 0282, 0381-83; APP-0877-78.

[38] *E.g.* Estate Brief 5-6, 41 (taking past Ventura quotes out of context, but still no derogatory comments about troops).

[39] AA-0119-21.

[40] AA-0110-23, 0838.

9

admitted that all of his special forces friends were willing to lie too to keep him out of trouble.[41]

Kyle's sworn testimony was that: (i) the incident happened well after dark, as he was packing up to leave;[42] (ii) while he and Ventura were on the "C" Avenue sidewalk behind McP's;[43] (iii) standing in a circle of 4-5 guys who were not more than 3 feet away;[44] (iv) all of whom saw and heard the whole thing;[45] (v) in plain sight of the police.[46] Kyle never identified those 4-5 guys, and none of them testified at trial.[47]

Bob Gassoff did not see or hear Kyle and Ventura speak to each other.[48] He could only say—after exchanging maps with Kyle prior to his deposition[49]—that

---

[41] AA-0079-83, 0184-86.

[42] AA-0088-90.

[43] APP-0456-57, 2434; AA-0103-04.

[44] APP-0460; AA-0098.

[45] AA-0102-03, 0174 ("Them other guys that were standing right there [heard it] exact same way."); AA-0780-90.

[46] AA-0103-04, 0158 ("The cops were watching. They saw the whole thing happen."); AA-0163 ("He went down, the cops were there.").

[47] AA-0174-75.

[48] AA-0497-99.

[49] AA-0490-91.

Appellate Case: 14-3876    Page: 18    Date Filed: 04/27/2015 Entry ID: 4269150

some kind of "commotion" occurred[50] near the center of the McP's patio, toward the wall on the parking lot side.[51]

Guy Budinscak thought he saw Ventura at McP's in the afternoon.[52] He, like Gassoff, described some "commotion" by the patio archway near the parking lot.[53] But he did not see Kyle anywhere near Ventura, did not see a fight, and did not see Ventura get hit.[54]

John Jones was admittedly intoxicated that night.[55] He did not hear Ventura say anything to Kyle, did not see Ventura get punched, and did not see Kyle around when the incident supposedly happened.[56] Contrary to wishing SEALs harm, moreover, he heard Ventura opine that SEALs should operate only at night because daytime operations are too dangerous for them.[57]

---

[50] AA-0500.

[51] AA-0493-96, 0704, 0708, 0874; APP-2400.

[52] AA-0545, 0546. *Compare* AA-0711-14 (Ventura picked up rental car at 7:39 p.m. at San Diego airport).

[53] APP-1765-66, 2393.

[54] AA-0547-52, 0553-57.

[55] AA-0663.

[56] APP-2428.

[57] AA-0661-62.

John Kelly had 15-20 drinks that night.[58]  He recalled that he was running

north on "C" Avenue toward Danny's bar when he looked back over his shoulder

in the dark and, for a split second, 30-35 yards away, saw Ventura and Kyle.[59]  But

he did not hear Ventura say the things attributed to him,[60] did not see Kyle punch

Ventura,[61] did not see Ventura fall,[62] and never spoke to anyone who did.[63]

Kevin Lacz was "shit hammered" drunk that night.[64]  Contrary to pictures of

Ventura at McP's in a "SEAL" T-shirt and jeans,[65] and his documented time of

arrival after 8:00 p.m.,[66] Lacz testified that Ventura was at McP's in the

afternoon,[67] wearing a Hawaiian shirt, shorts, and flip flops.[68]  Although Lacz said

---

[58] AA-0453-54, 0465-66.

[59] AA-0455-62.

[60] AA-0455.

[61] APP-1443.

[62] APP-1443.

[63] AA-0463-64, 0468.

[64] AA-0123-24, 0585-86, 0727-30.

[65] AA-0192-93, 0875, 0898.

[66] AA-0711-14.

[67] AA-0567-69.

[68] AA-0564-65.

in a recorded interview for the book that he saw Kyle "choking Ventura out,"[69] he testified that he did not hear Ventura and Kyle having angry words,[70] did not hear Ventura say SEALs deserve to die,[71] did not see Kyle punch Ventura,[72] and did not see Ventura on the ground.[73]  Lacz left McP's no later than 8:30-9:00[74]—which is about 2-3 hours before Kyle said the incident occurred—but Lacz thought the incident happened before he left, in the center of the patio near the building.[75]  Like Jones, Lacz recalled Ventura saying he did not like the idea of SEALs operating with regular forces because it is too dangerous.[76]

Andrew Paul also thought he saw Ventura on the patio in the afternoon,[77] wearing a Hawaiian shirt.[78]  He said Ventura was involved in an incident that

---

[69] AA-0587.

[70] AA-0574-76.

[71] AA-0573.

[72] APP-1870.

[73] AA-0577.

[74] AA-0566.

[75] APP-1842-43, 2421.

[76] AA-0570-73.

[77] AA-0469.

13

occurred inside the patio walls, and not out on the sidewalk.[79]  But Paul did not see Kyle and Ventura speak to each other, hear Ventura say SEALs deserve to lose a few or anything similar,[80] or see Kyle punch Ventura.[81]  He only knew what happened from the story Kyle told the next morning.[82]  Discrediting himself further, Paul claimed to have seen Ventura with a bloody lip, which everyone agrees, and pictures prove, he did not have.[83]

Debbie Lee views Kyle as her adopted son.  She was at McP's until 10:30 p.m. but did not see Kyle punch Ventura and, other than what Kyle told her, had no information about what happened.[84]

Debbie Job is the mother of a SEAL who was injured in Iraq.[85]  She did not hear or see any interactions between Ventura and Kyle,[86] but did see an altercation down the street that did not involve Ventura.[87]  She left by 10:00 p.m.[88]

---

[78] AA-0480; APP-2223 ("One witness might have mistaken [Ventura's] wardrobe and thought he remembered a Hawaiian shirt, but two?  That starts to look like collaboration and it starts to look like fabrication.").

[79] AA-0483.

[80] AA-0470-71.

[81] AA-0473-74, 0477-79.

[82] AA-0471-72, 0481, 0483-85.

[83] AA-0475-76, 0482.

[84] APP-1323; AA-0435-38.

Laura DeShazo was "positive" she was standing in the center of McP's patio around 7:00-7:30 p.m. when she witnessed Ventura, on the patio in a crowd in front of the building, get hit by someone.[89] Had that happened in the middle of the small, crowded patio, of course, there should have been dozens of witnesses who could not have missed it, including DeShazo's sister Rosemary.[90] No such witnesses were produced.

Rosemary DeShazo was with Laura all night and rarely left her side.[91] She did not see any altercation,[92] but she and her sister did pose for a picture with Ventura.[93] She testified that her brother—a SEAL who had served with Monsoor,

_____

[85] AA-0537-38.

[86] AA-0539-40, 0542-43.

[87] AA-0541.

[88] APP-1732; AA-0544.

[89] AA-0397 ("6:30 or 7:00"); AA-0401-07, 0410-12, 0715-21.

[90] AA-0394 ("She was probably close or near me."); AA-0408-09, 0448 ("He's a large person and he's easy to spot in a crowd"); AA-0875-76 (photos of what would have been DeShazo's view); AA-0873 (photo of crowded patio).

[91] AA-0395, 0398, 0446-47.

[92] AA-0445, 0452.

[93] AA-0392-93, 0398-400, 0442-43, 0898 (photo of DeShazos with Ventura).

was there when he was killed, and carried the casket[94]—was with them and likely took the photo.[95] She also testified that, when the photo was taken, Ventura said Monsoor "probably deserved it" and that SEALS "die all the time," but that no one in her group—including her SEAL brother—reacted to the comment.[96]

Jeremiah Dinnell swore in his deposition that he was standing on the sidewalk behind McP's and, when he looked over, saw the claimed incident occur inside the patio wall.[97] But, at trial, Dinnell claimed he was walking on the "C" Avenue sidewalk behind McP's at about 9:00 p.m.[98]—which is 1-1/2 to 2 hours before Kyle said the incident happened—and saw the incident occur ahead of him on the sidewalk, outside the wall.[99] In his new version, he also said he continued walking up the sidewalk after he saw Ventura get hit right in front of him—which means he would literally have had to step right over Ventura's body—but that he never saw Ventura on the ground.[100]

---

[94] AA-0389-91, 0395-96, 0401-02, 0439-41, 0444.

[95] AA-0398-99, 0443.

[96] AA-0449-51.

[97] AA-0504-20, 0532-36, 0708-09; APP-2416.

[98] APP-1657; AA-0504.

[99] AA-0501-24.

[100] AA-0523-28.

Appellate Case: 14-3876     Page: 24     Date Filed: 04/27/2015 Entry ID: 4269150

Ventura's counsel summarized the Estate's conflicting accounts with a McP's patio aerial photo that graphically depicted when and where each witness claimed the alleged altercation happened. No two saw the same incident, if at all, at the same time, in the same place. The times ranged from 7:00 to 11:00 p.m., some had Ventura wearing a Hawaiian shirt, and the locations were literally all over the board, with Dinnell himself providing two of them:[101]



---

[101] Map is a summary of Plaintiff's Exhibits 3, 6, 15, 17, 32, 37, 42, and 81,

Appellate Case: 14-3876     Page: 25     Date Filed: 04/27/2015 Entry ID: 4269150

No police report or hospital record was introduced at trial.[102]  And not one

photograph shows Ventura with a black eye[103] or otherwise evidences he was hit

directly in the face by a 220-pound trained killer, despite being on the blood-

thinning drug Coumadin at the time.[104]

### D.   DAMAGE TO REPUTATION

Ventura was elected Mayor of Brooklyn Park[105] and then Governor of

Minnesota.[106]  He has lectured and given speeches at colleges and universities

across the country,[107] and has written several best-selling books about his life,

political philosophies, and views of current and historical events.[108]

---

Defendant's Exhibit 98, and corresponding testimony.  APP-1577-81, 2400; AA-0492-93, 0703; APP-1489-95, 2407; AA-0504-16, 0520-22, 0530-36, APP-2416; APP-1842-45, 2421; APP-2104-08, 2428; AA-0201-06, AA-0715-21; AA-0086-105, APP-2434; APP-1788-91, AA-0560-62, APP-2393.

[102] AA-0387-88, 0924.

[103] *E.g.*, AA-0869, 0872, 0877, 0879-81, 0884.

[104] AA-0376-78, 0386.

[105] AA-0300-02.

[106] AA-0303-05.

[107] AA-0309-10.

[108] AA-0306-08, 0352-54; APP-1004.

Appellate Case: 14-3876     Page: 26     Date Filed: 04/27/2015 Entry ID: 4269150

One of the proudest achievements in Ventura's life was serving as a UDT/SEAL.[109] He has all the respect in the world for those who served with him, and those who served before and after, including his mother and father who both served in WWII.[110]

Ventura has been to more than a dozen UDT/SEAL reunions since 1990.[111] He has been asked to speak at military ceremonies, and he was honored as "Frogman of the Millennium."[112] He is so proud of his service that he had the SEAL Trident tattooed on his body,[113] and wore the trident on his lapel in his official portrait at the Minnesota State Capitol.[114]

Since *American Sniper* came out, Ventura cannot show his face anywhere current or former SEALs gather.[115] There is even a petition circulating to kick him

---

[109] AA-0278-81, 0379.

[110] AA-0287-89, 0297-99.

[111] AA-0311-12.

[112] APP-0952-55, 0960; AA-0844.

[113] APP-0874-75; AA-0287-88.

[114] APP-0962-63.

[115] AA-0362, 0384-85.

Appellate Case: 14-3876    Page: 27    Date Filed: 04/27/2015 Entry ID: 4269150

out of the UDT/SEAL Association, and it has been signed by dozens of active and retired SEALs.[116]

There are also tens of thousands of comments on Internet sites related to Kyle's story, calling Ventura a disgrace to the military and wishing death upon him, and he is publicly ridiculed and humiliated for the incident about which Kyle wrote.[117] Ventura's and Kyle's friends all agree that, if Ventura said the things Kyle wrote, he is no longer a SEAL, no longer a brother, and no longer welcome among them.[118]

Throughout his decades-long entertainment career, Ventura has never gone long without offers to work.[119] But after the book came out, and Kyle went on TV and radio to talk about him, Ventura's highly rated television show, "Conspiracy Theory," was first delayed for 11 months, then canceled.[120] And, for more than a

---

[116] AA-0226-28, 0310-11, 0365-68, 0845-51.

[117] AA-0283-86 (*e.g.*, "Hey, Ventura, you got your bitch ass kicked. Get over it or kill yourself. Actually you know what? Do both.").

[118] AA-0224-25, 0265, 0466-67, 0486-87, 0529, 0558-59, 0563, 0578-79.

[119] AA-0363-64.

[120] AA-0347-52, 0368-70.

Appellate Case: 14-3876     Page: 28     Date Filed: 04/27/2015 Entry ID: 4269150

year after, no new offers came in.[121]  Ventura's 2012-13 income was the lowest it had been in a decade.[122]

###  E.    UNJUST ENRICHMENT

*American Sniper* was an unknown book by an unknown, first-time author.[123] Kyle thought the book would appeal only to a small niche of people who like to read about war.[124]  HarperCollins had no idea it would be a big success,[125] and its publicist, Sharyn Rosenblum,[126] thought it tremendous that there were 3,000 pre-orders.[127]  The book was released on January 3, 2012,[128] and there was only a very short window of time to get publicity before newer books came out.[129]

---

[121] AA-0368-69 ("It's come to a screeching halt"); AA-0371 ("[The offers] completely dried up.").

[122] AA-0372-73.

[123] AA-0624.

[124] AA-0108.

[125] AA-0109.

[126] AA-0615-16.

[127] AA-0624.

[128] AA-0153, 0625.

[129] AA-0621-22.

Appellate Case: 14-3876     Page: 29     Date Filed: 04/27/2015 Entry ID: 4269150

On January 4, Kyle appeared on national radio show *Opie and Anthony* and identified "Scruff Face" as Ventura.[130]  Kyle and the radio hosts mocked Ventura and joked about his age and physical condition.[131]  Rosenblum described Kyle's interview a "hit."[132]

On January 5, Kyle appeared on FOX TV's *The O'Reilly Factor*.[133]  It was a "big get" because host Bill O'Reilly sells more books than anyone.[134]  The very first question O'Reilly asked Kyle was, "you say you knocked Jesse Ventura to the floor with a punch?"[135]  Not until halfway through the interview did O'Reilly mention "the other thing in the book," *i.e.*, Kyle's service record.[136]

HarperCollins editor Peter Hubbard described the related FOX News Internet story about the Ventura punch as "priceless."[137]  Rosenblum agreed the

---

[130] ADD-0058-64; AA-0018-19, 0153-54, 0744-50, 0906 (Video of Kyle's appearance).

[131] AA-0154-59, 0647, 0751-58.

[132] AA-0626-27.

[133] ADD-0065-68; AA-0020-22, 0160-62, 0623 (Fox and HarperCollins are owned by the same company), 0761-69, 0904 (Video of Kyle's appearance).

[134] AA-0630-31.

[135] AA-0161-62, 0761-69, 0904.

[136] AA-0632, 0759-60, 0904.

[137] AA-0628-29, 0759-60.

Appellate Case: 14-3876     Page: 30     Date Filed: 04/27/2015 Entry ID: 4269150

Ventura story was getting a lot of media impressions that drove interest in the book; in her words, the Ventura story was "Hot, Hot, Hot!!!"[138]

On January 6—three days after it went on sale—the book rocketed to number one and HarperCollins ordered 100,000 reprints, about which Hubbard exclaimed, "Holy Shit!"[139]  HarperCollins sent a Public Relations News Flash to all of its customers, including major book sellers like Amazon.com and Barnes and Noble, providing video clips and Internet URL links to Ventura stories in the media with captions like, "Navy-Seal-Punched Ventura."[140]

By January 8 the Ventura story went viral on the Internet.[141]  No other interviews Kyle did had that kind of public interest or created any controversy, or got near the attention.[142]

On January 9, co-author Jim DeFelice commented that the Ventura story has caused the book to "go crazy."[143]  Rosenblum added that Kyle is a phenomenon,[144]

---

[138] AA-0627-29, 0759-60.

[139] AA-0633-37, 0643, 0770, 0896-97.

[140] AA-0180-82, 0637-40, 0794-98, 0891-95.

[141] AA-0164-65, 0614, 0771.

[142] AA-0168.

[143] AA-0169, 0774-78.

[144] AA-0644, 0774-78.

23

exclaiming: "honestly, who would have thought!?"[145] Kyle was suddenly a "known" author.[146]

On January 10—after Ventura had publicly declared the story false[147]—Kyle went on *Opie and Anthony* for the second time and talked again about the Ventura story.[148] On January 11, Hubbard described another mention of the Ventura story by O'Reilly as "a nice little bonus hit."[149] Rosenblum "TOTALLY!" agreed,[150] and also concurred with Hubbard that sales were nothing short of astonishing.[151]

HarperCollins incorporated the terms "Ventura," "O'Reilly," and "Kyle" into its Internet marketing strategy.[152] The book spent the next 18 weeks on the New York Times bestseller list, becoming "by far" the most successful book

---

[145] AA-0170-71, 0645-46, 0779, 0899-902.

[146] AA-0646.

[147] AA-0166-67, 0641-42, 0772-73.

[148] AA-0023-26, 0172-73, 0780-90, 0925.

[149] AA-0178-79, 0648, 0792.

[150] AA-0178-79, 0648, 0792.

[151] AA-0649.

[152] AA-0650-53, 0793, 0889-90.

Appellate Case: 14-3876    Page: 32    Date Filed: 04/27/2015 Entry ID: 4269150

Hubbard ever edited.[153]  Rosenblum conceded that book sales became self-perpetuating because people read bestsellers.[154]

In October 2013 the book was republished as a "Memorial Edition," with the Ventura story included.[155]  Rosenblum booked Taya Kyle on *O'Reilly* in mid-2013, and Kyle's January 2012 interview about Ventura was replayed during her appearance.[156]

HarperCollins royalty statements produced by the Estate showed 559,923 books having been sold through 2013.[157]  Hubbard confirmed, however, that more than 1.5 million books had actually been sold.[158]  From the statements available,[159] and the publishing contract, royalties to the Estate were calculated to be $6,072,750 at the time of the trial, with sales continuing.  Even assuming substantial discounts and lower royalties on paperbacks, the royalties to the Estate

---

[153] AA-0660.

[154] AA-0176-77, 0643-44, 0791.

[155] AA-0056-57.

[156] AA-0027-35, 0839-43, 0903.

[157] AA-0037-40, 0043-51, 0824-37, 0852-64, 0907-0921; *see also* AA-0052-53 (Taya Kyle testifying that she did not have a royalty statement for the first one-half of 2014); AA-0654.

[158] AA-0660.

[159] AA-0824-35, 0853-63, 0907-19.

Appellate Case: 14-3876     Page: 33     Date Filed: 04/27/2015 Entry ID: 4269150

would still be in the $5 million range.  The book was also made into a movie,[160] for which the upfront money alone was $750,000, plus 5% of the back-end profits.[161]

## F.    INSURANCE

The Estate had HarperCollins employees Rosenblum and Hubbard fly in from New York to testify that the Ventura story had no effect on book sales.[162] Only after Rosenblum's direct examination did the district court overrule the Estate's objection to admitting evidence of HarperCollins' insurance policy and allow limited inquiry to show its employees' bias.[163]

On cross-examination, Rosenblum said she did not know "the legal fees for the [Estate's] attorneys … are being paid by the insurance company for HarperCollins," or that "HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance."[164]  Hubbard testified on cross that HarperCollins does not employ fact checkers, but he did not know that, "to protect [itself] on the back end, [it] obtain[s] insurance coverage in

---

[160] AA-0056, 0799-822.

[161] AA-0041-42, 0048-50, 0183, 0823, 0922-23.

[162] AA-0617-20, 0655-57.

[163] APP-1995.

[164] APP-1997-98.

Appellate Case: 14-3876     Page: 34     Date Filed: 04/27/2015 Entry ID: 4269150

the case when an author may get sued for libel or defamation."[165]  Hubbard

admitted, however, that he had read Kyle's publishing contract[166]—earlier received

in evidence without objection—which plainly identifies the HarperCollins

insurance policy and names Kyle as additional insured.[167]

### G.     FAILURE TO PRESERVE ARGUMENTS FOR APPEAL

Prior to entry of judgment the Estate never argued that Ventura's unjust

enrichment claim is barred by Minnesota law or the First Amendment.  Its two

summary judgment motions challenged the factual, not the legal, basis for the

unjust enrichment claim.[168]  Its pre-trial proposed jury instructions stated the

elements of an unjust enrichment claim under Minnesota law.[169]  It did not object

---

[165] AA-0658-59.

[166] APP-2066, 2435-2448.

[167] AA-0054-55 ("Mr. Borger: No objection.").

[168] ECF 25, 234; ADD-0015, 0032-53; APP-0043-76.  *Compare* ADD-0036-39,
First Order Denying Summary Judgment (Kyle argued only that Ventura's
appropriation of name and likeness claim was barred by the First Amendment, and
that the unjust enrichment and defamation claims were duplicative); ADD-0052-
53, Second Order Denying Summary Judgment (Estate arguing unjust enrichment
damages limited to book, and not movie, proceeds); and ADD-0016, n.4, Order
Denying Motion for JMOL or New Trial (argument that unjust enrichment barred
as matter of law should have been raised earlier, but was not).

[169] APP-0094; ADD-0016 (Estate submitted "proposed jury instructions … replete
with legal argument … but which did not assert the unjust enrichment claim was
barred as a matter of law."); ECF 297 at 8-9.

Appellate Case: 14-3876     Page: 35     Date Filed: 04/27/2015 Entry ID: 4269150

during trial when Ventura introduced substantial evidence of the revenues received from *American Sniper* sales to prove his unjust enrichment claim.[170] And, at the close of Ventura's case, the Estate made a Rule 50(a) motion for JMOL, arguing only that Ventura's unjust enrichment claim lacked evidentiary support.[171]

Before closing arguments the Estate also filed its revised Proposed Instruction No. 25, "Elements of the Claim of Unjust Enrichment," which stated: "A defendant has been unjustly enriched if he has 'knowingly received or obtained something of value for which [he] in equity and good conscience should pay.'"[172] The district court's Jury Instruction No. 10 adopted the Estate's proposed language,[173] and the Estate never objected.[174]

Absent any objection or argument that the unjust enrichment claim was barred as a matter of law, the advisory jury awarded Ventura $1,345,477.25.[175] The district court adopted that verdict as its own and entered judgment.[176]

---

[170] ADD-0016-17; *see also, e.g.*, AA-0037-40, 0043-51, 0660, 0824-37, 0852-64, 0907-21.

[171] ADD-0016-17; ECF 349 at 2-4; AA-0004.

[172] ECF 358 at 12.

[173] APP-2286.

[174] ADD-0017; AA-0665-69 (charging conference, proposed Instruction No. 10); AA-0681-700 (district court's instructions to the jury).

[175] APP-2385-86.

28

Nearly a month later, the Estate filed its post-trial Motion for Judgment as a Matter of Law or New Trial,[177] arguing for the first time that, "The unjust-enrichment award violates Minnesota law and the First Amendment."[178] The district court concluded that the arguments had been waived.[179]

## SUMMARY OF THE ARGUMENT

The Estate and Amici raise several legal issues regarding Ventura's successful defamation claim, including their view that the First Amendment requires public figure defamation plaintiffs to prove falsity by clear-and-convincing evidence—a standard that has never been applied by the U.S. Supreme Court, the Eighth Circuit, or the Minnesota Supreme Court. But the doctrine of constitutional avoidance dictates that courts should not give unnecessary answers to constitutional questions; and here the district court has made it unnecessary to answer the constitutional question because it specifically found that Ventura proved Kyle's story was false by clear-and-convincing evidence.

---

[176] ADD-0001-07.

[177] ECF 404.

[178] ECF 406 at 1; ADD-0017-18 ("[The Estate] had ample opportunity to argue Plaintiff was precluded from proceeding on a theory of unjust enrichment, but failed to do so.").

[179] ADD-0016-18.

29

The Estate also takes issue with the district court's instructions, arguing that the jury should have been told to consider each sentence and phrase of Kyle's story in isolation, and should have been given a "legal definition" for the term "serious doubts" as it applies to the actual malice standard. But there is no abuse of discretion because, first, there is no binding or even persuasive precedent that required the district court to instruct the jury to consider isolated words and phrases out of context; and, second, the Supreme Court has defined "reckless disregard for the truth" using several interchangeable definitions, one of which is "serious doubts."

Using the pretext of an "independent review of the record," the Estate next questions the evidence supporting the judgment, essentially asking this Court to substitute its judgment for that of the trial court and jury who heard the evidence and made credibility determinations. The Court should decline to do so, and instead should give proper deference to the finders of fact and affirm the judgment because it is supported by substantial evidence.

The Estate's arguments that the unjust enrichment claim is barred as a matter of Minnesota law and by the First Amendment were not timely raised below and cannot be raised here because they have been waived. But even if the Estate had raised its arguments before the judgment was entered, they simply have no merit. Minnesota law does not bar the unjust enrichment claim; contrary to the Estate's

30

argument, it is not the existence, but the absence of, a pre-existing contractual relationship between Ventura and Kyle that allows equity to imply one, and Ventura had no adequate legal remedy to recover the Estate's unjust gains. Nor is there any constitutional bar to Ventura's equitable claim, because the Estate was afforded the same First Amendment protections on the unjust enrichment claim that the constitution requires for the defamation claim. And, once actual malice is proved, there is no First Amendment protection.

Finally, the Estate is not entitled to a new trial based on Ventura's limited cross-examination regarding the publisher's insurance policy because the evidence was admissible under Fed. R. Evid. 411 and, in any event, had already been received without objection through Kyle's Publishing Agreement. So, even if the Estate did not waive its argument by failing to object to the Publishing Agreement, any error by the district court in allowing cross-examination on the issue of insurance can only be viewed as harmless.

## STANDARD OF REVIEW

The Estate insists that this Court make an "independent examination" of the record to determine whether sufficient facts exist to support the jury's findings of material falsity and actual malice. But at no point does the Estate explain what an "independent examination" of the record following a jury verdict looks like, nor

does it address the proper standard for reviewing all of the other issues raised on appeal, including its complaints about jury instructions and evidentiary rulings.

> To clarify:

> This Court's "independent review function is not equivalent to a 'de novo' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." Instead, we … review the evidentiary basis of critical facts, giving *due regard to the trial court's opportunity to observe the demeanor of witnesses.*

*Families Achieving Independence & Respect v. Neb. Dept. Soc. Serv.*, 111 F.3d 1408, 1411 (8th Cir. 1997) (emphasis added) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 514 n. 31 (1984)). Independent appellate review "'is not a limitless ransacking of the record as a whole,'" and "'[p]urely factual determinations (such as credibility calls) remain subject to the usual degree of deference.'" *Dendall v. Daily News Pub. Co.*, 716 F.3d 82, 88 (3rd Cir. 2013) (quoting *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 208 (1st Cir. 2006)).

> Following a two-step process:

> The reviewing court first determines what credibility determination the jury must have made.  This is done by discarding evidence or testimony that the "jury *must* have rejected" ….  The evidence which is not excluded … is then weighed "alongside the undisputed evidence" to determine if the defendant acted with actual malice.

*Id.*  In other words, the Court "must figure out, as best [it] can from the cold record, which evidence the jury accepted as credible, and which it discarded.  Then

[it] must determine whether the *believed* evidence establishes actual malice."
*Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997).

For all other matters raised in this appeal, including factual findings
unrelated to the issues of material falsity and actual malice, the standard of review
remains unchanged. *See, e.g.*, *Families*, 111 F.3d at 1411 ("There are, of course,
many findings of fact in a defamation case that are irrelevant to the constitutional
standard … and to which the clearly-erroneous standard of Rule 52(a) is fully
applicable."). Thus, jury instructions are reviewed for abuse of discretion, *Brown
v. Sandals Resorts Int'l*, 284 F.3d 949, 953 (8th Cir. 2002), as are the district
court's evidentiary rulings, *Shaw Group, Inc. v. Marcum*, 516 F.3d 1061, 1068 (8th
Cir. 2008). And, "[a]t every stage of the proceeding, the court must disregard all
errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P.
61.

## ARGUMENT

*"Courts should think hard, and then think hard again, before turning small cases into large ones."*[180]

## I. DEFAMATION

### A. The Court Need Not Decide Whether the Constitution Requires Proving Falsity by a Heightened Standard.

"'It is not the habit of the court to decide questions of a constitutional nature *unless absolutely necessary to a decision of the case*.'" *Wallace v. Conagra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)). Thus, "courts must make every effort to avoid deciding novel constitutional questions." *Id.*; *see also O'Brien v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 862, 863 (8th Cir. 2014) ("[T]he doctrine of constitutional avoidance particularly counsels us not to give unnecessary answers to constitutional questions.").

The Estate invites this Court to adopt a new, higher standard, requiring proof of falsity by clear-and-convincing evidence in public figure defamation cases. The proposed standard has never been adopted by the U.S. Supreme Court, this Court, or the Minnesota Supreme Court. Instead, the only U.S. Supreme Court case to address the standard is *Harte-Hanks Commc'ns, Inc. v. Connaughton*, which

---

[180] *Camreta v. Greene*, 131 S.Ct. 2020, 2032 (2011).

34

"express[ed] no view on [the] issue."  491 U.S. 657, 661 n. 2 (1989).  And, by declining to address the question, the Supreme Court let the lower court's application of the preponderance burden *stand*.  *Id.* at 661.

This Court too has declined to rule that proof of falsity requires clear-and-convincing evidence.  *See, e.g.*, *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 567 (8th Cir. 2001) ("Although it is debatable as to whether the element of falsity must be established by clear-and-convincing evidence or by a preponderance of the evidence … here we find that Campbell and Lane failed to satisfy even the lower threshold.").  And, in the only federal circuit court decision on which the Estate relies, the Second Circuit avoided the constitutional question altogether by predicating its ruling on state law.  *DiBella v. Hopkins*, 403 F. 3d 102, 111 (2d Cir. 2005) ("[W]e are persuaded that [New York] law requires clear and convincing proof of falsity, and decline therefore to address this open question in federal constitutional law."); *but see Rattray v. City of Nat'l City*, 36 F.3d 1480, 1487, *modified*, 51 F.3d 79 (9th Cir. 1994) ("The only circuit that has decided the question held that proof of the actual falsity of allegedly defamatory statements need only be proven by a preponderance of the evidence. … We adopt the holding of the Second Circuit[,] … [which] noted in *Goldwater v. Ginzburg*, '[t]here is nothing in *New York Times v. Sullivan* or elsewhere' to support the 'novel theory' that other elements of a defamation claim must be proved by clear and convincing

35

evidence.") (citing 414 F.2d 324, 341 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049 (1970)).

As it has done in the past, this Court should once again decline to create a new standard for proof of falsity; it is unnecessary to do so on the facts of this case because the district court specifically found that Ventura had submitted sufficient evidence to prove falsity by clear-and-convincing evidence:

> [I]n the Court's view the evidence here, viewed in the light most favorable to the verdict, … was sufficient to prove falsity by this higher standard. Defendant contends Plaintiff failed to surmount this hurdle because clear-and-convincing evidence requires something more "than one man's word against another['s]," … but far more was presented here. Indeed, *several* witnesses testified consistently with Plaintiff, and other evidence—such as the absence of obvious injury in photographs taken after the incident—supports Plaintiff's version of events.[181]

Because the district court found the evidence sufficient to prove falsity under either the preponderance or clear-and-convincing evidentiary standard, and "the doctrine of constitutional avoidance particularly counsels us not to give unnecessary answers to constitutional questions," this Court should decline the opportunity to weigh in on the issue and instead allow the district court's jury instruction on falsity, and the jury's verdict, to stand. *O'Brien*, 766 F.3d at 863.

---

[181] ADD-0013 n.1; *see also* ADD-0023 ("[N]o binding authority required the Court to impose such an onerous evidentiary standard, and in any event the evidence here was sufficient to meet it.").

Appellate Case: 14-3876    Page: 44    Date Filed: 04/27/2015 Entry ID: 4269150

## B.	The District Court's Jury Instructions Regarding Defamation Do Not Constitute an Abuse of Discretion.

The district court "'has a great deal of discretion in framing the jury instructions and the court need not give the exact language desired by the parties.'" *Ryther v. KARE 11,* 108 F.3d 832, 847 (8th Cir. 1997). On appeal, "review is limited to whether the jury instructions, taken as a whole, 'fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case.'" *Brown*, 284 F.3d at 953. A court abuses its discretion when refusing to adopt a proposed instruction only if the proposed instruction: "(1) correctly state[d] the applicable law; (2) address[ed] matters not adequately covered by the charge; and (3) involve[d] a point 'so important that failure to give the instruction seriously impaired the party's ability to present an effective case.'" *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492, 496 (8th Cir. 1998).

### 1.	The District Court Correctly Instructed the Jury to View Kyle's Statements Within the Context of the "Story" as a Whole.

Ventura has never claimed in this lawsuit that his reputation was damaged by individual words and phrases taken out of context and viewed in isolation. Ventura's claim, and the one submitted to the jury, is that Kyle's story as a whole was knowingly fabricated and was harmful to his reputation.[182] Yet the Estate

---

[182] ADD-0025; AA-0702.

37

submitted an argumentative and confusing Proposed Special Verdict Form that attempted to deconstruct Kyle's story to the point of meaninglessness, and would have required answers to 24 separate questions before the jury even got to defamation damages, which then would have required answers to another seven questions.[183]

Instead of giving the Estate's laborious instructions, the court correctly instructed that:

> Mr. Ventura must prove: One, Mr. Kyle's story about Mr. Ventura was defamatory; Two, the story was materially false; and Three, Chris Kyle published the story knowing it was false, believing it was false, or having serious doubts about its truth.[184]

The jury later asked:

> In jury instruction #8, when referring to Mr. Ventura's story (Punching Out Scruff Face) is the "story" the sub-chapter or the 3 lines? ("he hates America," "were killing men & women and children and murdering," "deserve to lose a few").[185]

The district court correctly answered:

> "The story," as used in Instruction No. 8 (and other Instructions), refers to the statements Mr. Kyle made about Mr. Ventura in the

---

[183] APP-0090-95.

[184] APP-2281 (Instruction No. 8); APP-2282-84 (Instructions 8A-C, further explaining Ventura's burden of proof on the elements of defamatory meaning, falsity, and actual malice); *see also* Fed. R. Civ. P. 49 (decision to use a general or special verdict form within district court's discretion).

[185] APP-2292.

Appellate Case: 14-3876    Page: 46    Date Filed: 04/27/2015 Entry ID: 4269150

Punching Out Scruff Face subchapter and on television and radio, which include the three statements identified in your question. You are instructed to consider each element of Instruction No. 8 as to the story <u>as a whole</u>.[186]

This instruction was consistent with Minnesota law. *See, e.g.*, *Dunham v. Opperman*, No. A06-750, 2007 WL 1191599 at *3 (Minn. Ct. App. April 24, 2007) (letter must be "taken as a whole" to determine defamatory meaning); *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 304 (Minn. Ct. App. 2001) ("[R]estricting the jury's consideration [to the statement on its face] resulted in an [erroneous] instruction that told the jury [it] could not consider all contextual evidence in determining … defamatory meaning. … [W]ords must be construed in context."); *Harman v. Heartand Food Co*., 614 N.W.2d 236, 240 (Minn. Ct. App. 2000) ("Whether a defamatory meaning is conveyed is dependent upon how an ordinary person understands 'the language used in the light of surrounding circumstances.'").[187]

The Estate admits in its brief that "the defamatory import of the three statements at issue is properly assessed in the context of the publication as a whole."[188] And, when given the opportunity to comment before the district court's

---

[186] APP-2310; ADD-0023-24.

[187] The same argument has been rejected twice before. *See* AA-0002, 0004.

[188] Estate Brief 34, n.1.

answer, its counsel "conceded the issue was not whether these three statements were defamatory in *isolation*, but rather whether they were defamatory when viewed in *context*; indeed, defense counsel '*want[ed] them*'—meaning the jury— 'to read these things in context.'"[189]

Contrary to its own admissions, however, the Estate clings to its untenable position that Kyle's "story" consists only of three discreet statements, each of which must be broken out and considered separately and in isolation.[190] But none of the three statements, viewed alone, are capable of conveying the defamatory meaning the entire fabricated story was intended to communicate. That is because, when taken out of their context, words and phrases lose not only their original meaning, but their power to evoke emotion and to cause harm.

It is one thing to make derogatory comments about America or the SEALs. It is quite another for a proud former SEAL to make them at a SEAL wake, in front of the deceased hero's family and those who fought by his side, and then be physically punished and ridiculed by the SEAL brotherhood for having done so. That, however, is the story Kyle told. Because it is the entire fabricated story—not a few words in it—that made Ventura *persona non grata* in the military

---

[189] ADD-0024; APP-2296 ("We would agree that those three statements can be considered in the context of the entire story[.]"); APP-2298 ("We want them to read these things in context.").

[190] APP-2305-06.

Appellate Case: 14-3876    Page: 48    Date Filed: 04/27/2015 Entry ID: 4269150

community, and it is the fictional incident as a whole that damaged Ventura's reputation, the district court correctly refused the Estate's invitation to *define* the "story" in terms only of three isolated phrases.[191]

The Estate cites several cases in support of its argument that the First Amendment requires each "statement" to be analyzed separately. But none of the cited decisions actually say that. Instead, the cases fall into three categories, including those: (1) in which the plaintiff pled or otherwise limited his claim to specific statements;[192] (2) that are not relevant because the court ruled on statutory or other grounds;[193] and (3) where the court did in fact consider whether the whole "story" was defamatory.[194]

---

[191] APP-2299.

[192] *Masson v. New Yorker Magazine*, 501 U.S. 496, 502 (1991) ("We discuss only the passages relied on by [the plaintiff] in his briefs … ."); *Stepnes v. Ritschel*, 663 F.3d 952, 964 (8th Cir. 2011) (plaintiff "challenged" isolated statements in a television news story); *Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864, 868-69 (8th Cir. 2005) (plaintiff "challenge[d] … seven statements" in a newspaper article); *Michaelis v. CBS Inc.*, 119 F.3d 697, 700-03 (8th Cir. 1997) (plaintiff's "complaint alleged that three statements in the report were defamatory").

[193] *Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 863, n.3 (2014) ("[A]pplying the material falsity standard to a defamation claim is quite different from applying it to [the] ATSA immunity" claim under consideration).

[194] *Price v. Viking Penguin*, 881 F.2d 1426, 1445 (8th Cir. 1989) ("In *St. Amant v. Thompson*, the Court indicated what types of evidence might suffice to show reckless disregard in a **story**: if there was evidence that the **story** was fabricated …"); *McKee v. Laurion*, 825 N.W.2d 725, 729, 731-32, 734 (Minn. 2013)

41

A case cited by the Estate for another proposition, *Brokers' Choice of Am. v. NBC Universal, Inc*., further undercuts its argument.  *See* 757 F.3d 1125, 1136 (10th Cir. 2014).  That court started from the proposition that, "[a] finding that the language used was defamatory must be predicated on the context of the entire story and the common meaning of the words utilized."  *Id.* at 1136.  It went on to explain: "While statements may appear to be true when viewed in isolation, we consider the entire context to determine if a false impression is projected, 'including the medium through which it is disseminated and the audience to whom it is directed.'"  *Id.* at 1137.  And, leaving no doubt that it was rejecting the approach the Estate advocates here, the *Brokers' Choice* court concluded that the "district judge [incorrectly] analyzed each of Clark's statements aired by Dateline individually and decided, with respect to each, whether or not it was substantially true."  *Id.* at 1138 ("[T]o determine whether statement is defamatory, 'the entire

---

("Whether a defamatory meaning is conveyed depends upon how an ordinary person understands 'the language used in the light of surrounding circumstances' [and] … the words 'must be construed as a whole without taking any word or phrase out of context.'"); *West v. Media Gen. Operations, Inc*., 120 Fed. Appx. 601, 615 (6th Cir. 2005) ("The court and jury are necessarily required to also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript.").

42

published statement must be examined in context, not just the objectionable word or phrase[.]'").

Because the instructions, when viewed as a whole, fairly and accurately presented the issues to the jury, the district court did not abuse its discretion.

**2.      The District Court Did Not Abuse Its Discretion by Refusing to Instruct the Jury on the Definition of "Serious Doubts."**

Defamatory statements about a public figure are not protected by the First Amendment if they are made with "actual malice," meaning that they are knowingly false or were written with reckless disregard for the truth.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331-32 (1974).  On the issue of "reckless disregard for the truth," the district court instructed the jury that Ventura must prove by clear-and-convincing evidence that "Mr. Kyle published the story about Mr. Ventura despite: 1. Knowing the story was false; *or* 2. Believing the story was false; *or* 3. Having serious doubts about the story's truth."[195]  The Estate concedes that "[t]his instruction was based on settled case law."[196]

The Estate, however, takes issue with the district court's refusal to give a definition of "serious doubt" in response to the jury's question, "What is the legal

---

[195] APP-2284.

[196] Estate Brief 45.

definition of 'serious doubt?'[197] The court answered: "There is no legal definition of 'serious doubt.' You will have to rely on your common sense in interpreting and applying the standard set forth in Instruction 8C."[198] Ignoring the fact that supplemental jury instructions are reviewed for *abuse of discretion*, the Estate argues that refusal to define "serious doubt" constitutes an "error" warranting a new trial. It is wrong. *See United States v. Piatt*, 679 F.2d 1228, 1231 (8th Cir. 1982) ("[I]t is settled that the request for additional instructions is a matter addressed to the sound discretion of the judge.").

Undercutting its own argument, the Estate cites to three separate cases— none of which *define* the term. *Harte-Hanks*, for example, says only that "the defendant must have made the false publication with a 'high degree of awareness of … probable falsity' … **or** must have 'entertained serious doubts as to the truth of his publication.'" 491 U.S. at 667 (emphasis added). The district court did not abuse its discretion, therefore, because the Estate's preferred phrase, "high degree of awareness of probable falsity," and the standard included in the instructions, "serious doubts," are alternative and acceptable ways to define "reckless disregard." *Campbell*, 255 F.3d at 569 ("[A] public-figure plaintiff must also prove … that the defendant made false remarks with a high degree of awareness of

---

[197] APP-2328.

[198] APP-2329.

Appellate Case: 14-3876    Page: 52    Date Filed: 04/27/2015 Entry ID: 4269150

probable falsity, **or** that the defendant entertained serious doubts as to the truth of his publication."); *Masson*, 501 U.S. at 511 ("In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity.").[199]

The Estate speculates that the court's "refusal to assist" when asked for a definition "forced the jury to guess at the meaning" of "serious doubt." But the words "serious" and "doubt" are commonly understood,[200] and in the context of the instructions given it must be presumed that the jury understood what they meant. *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F. 3d 1032, 1041 (8th Cir. 2011) ("A jury is presumed to follow its instructions[.]"); *see also United States v. White*, 794 F.2d 367, 370 (8th Cir. 1986) (finding no abuse of discretion where district court responded to jury's request for a "definition of 'conspiracy'" by "referring the jurors to the original jury instructions.").

Because the Court's instructions, taken as a whole, accurately state the law, and because the Estate was in no way prejudiced, the district court did not abuse its discretion and there is no basis for a new trial.

---

[199] ADD-0027-28.

[200] *E.g.* Amici Scholars' Brief at 9 n.4 (quoting *Webster's* definition).

Appellate Case: 14-3876     Page: 53     Date Filed: 04/27/2015 Entry ID: 4269150

## C. The Evidence Supports the Jury's Verdict.

On appeal from a jury verdict, this Court must "consider the evidence in the light most favorable to the verdict, giving the prevailing party the benefit of all reasonable inferences." *Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014). Although the court must make an independent examination of the facts establishing material falsity and actual malice, the Court must still give due regard for the fact finders' ability to observe the witnesses, and "'[p]urely factual determinations (such as credibility calls) remain subject to the usual degree of deference.'" *Dendall*, 716 F.3d at 88 (quoting *Families*, 111 F.3d at 1411).

### 1. The Evidence Clearly and Convincingly Establishes that Kyle's Story Was False.

During trial, the Estate attempted to show that Kyle's story was substantially true by presenting witness testimony to supposedly corroborate Kyle's account. Ventura, on the other hand, presented not only witness testimony, but also photographs and documents establishing that Kyle's firsthand account of the incident was false. Ventura, Leonard, and the DeWitts all testified that Kyle's story was a complete fabrication: there was no altercation; and Ventura did not make any of the alleged statements. As the district court explained when denying the Estate's post-trial motions, the "case largely boiled down to a credibility contest," wherein "several witnesses testified consistently with Plaintiff, and other

46

evidence—such as the absence of obvious injury in photographs taken after the incident—supports Plaintiff's version of events."[201]

In finding for Ventura on the issue of material falsity, the jury must necessarily have found Ventura and his witnesses credible, and Kyle and his witnesses not credible. The Estate asks this Court to substitute its own judgment for that of the jury and trial court, and to disregard Ventura's witnesses on the ground that they were supposedly less credible or fewer in number than Kyle's. That argument, however, runs contrary to the applicable standard of review, which requires the Court to draw all reasonable inferences in favor of the verdict without making credibility assessments. *See Dendall*, 716 F.3d at 88; *Families*, 111 F.3d at 1411.

The Estate also misstates the evidence. The map at page 43 of the Estate's brief, for example, was created solely for this appeal, was not before the jury, and is grossly inaccurate. The only witness who even came close to corroborating Kyle's story was Dinnell, but he told two completely different and inconsistent versions under oath, each of which is improbable in itself. The others, to the extent they saw or heard anything at all, told wildly conflicting accounts that made no sense, including those who had Ventura on the patio hours before his plane landed,

---

[201] ADD-0012-13.

wearing a Hawaiian shirt, shorts, and flip-flops, and getting knocked to the ground in the middle of the small, crowded patio without anyone else noticing.

Ventura has for years been on blood thinning medication[202]—identified by the Estate's counsel as Coumadin[203]—and even minor bumps, cuts or scrapes cause him to bruise easily and bleed excessively.[204]  A reasonable jury could certainly conclude that a 55-year-old man on blood thinners who had been punched directly in the face and knocked to the ground by a 220-pound Navy SEAL trained in hand-to-hand combat[205] should at least have some swelling, discoloration, or other sign of blunt-force trauma the next day.  But numerous photographs from that night show Ventura smiling, talking, and posing for pictures with younger SEALS at McP's.  And photographs from the next two days, including the graduation ceremony at which Ventura was supposedly ridiculed for having a black eye, show absolutely no sign of facial trauma whatsoever, and no hospital record was ever produced showing that Ventura had been treated for his alleged injuries.  Kyle also testified that the police were nearby and saw the incident, but a certified letter from the Coronado Police Department confirmed that there is no

---

[202] AA-0335-38.

[203] AA-0376-78.

[204] AA-0335-37, 0376-78.

[205] AA-0106-07.

Appellate Case: 14-3876     Page: 56     Date Filed: 04/27/2015 Entry ID: 4269150

record of any incident involving either Jesse Ventura, a.k.a. James Janos, or Chris Kyle.

Of no lesser importance is that Kyle claimed that Ventura was punched because he declared, in the presence of Kyle's SEAL friends, that SEALs deserve to lose a few. But even Ventura's witnesses testified that, if he had made that or any similar statements, he definitely would have been punched. That he was not is persuasive evidence that the statements were never made, and that the entire incident was fabricated.

Based on this, and other evidence, the district court concluded that Ventura "proffered sufficient evidence upon which a jury could conclude that Kyle's statements were materially false."[206] The jury was free to believe Ventura and his witnesses, and to disbelieve Kyle and his—all of whom gave accounts that were both improbable and impossible to reconcile with one another and the photographic and other evidence. Because this Court cannot substitute its credibility determinations for the jury's, and Ventura's evidence, if credited, is both clear and convincing, he has met his burden on the issue of material falsity.

---

[206] ECF 269 at 10.

## 2. The Evidence Clearly and Convincingly Establishes that Kyle Acted with Actual Malice.

As both the jury and district court found, Ventura submitted sufficient evidence to clearly and convincingly establish actual malice. Because direct evidence of a defendant's subjective knowledge of falsity is rare, a defamation plaintiff "is entitled to prove actual malice by circumstantial evidence." *Stokes v. CBS Inc.*, 25 F. Supp. 2d 992, 1003 (D. Minn. 1998) (citing *Harte-Hanks*, 491 U.S. at 668). A defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination[.]" *Id.*[207]

The evidence discussed above that establishes falsity also establishes actual malice.[208] Kyle claimed Ventura made the statements directly to him and that he responded by punching him in the face. Ventura, the DeWitts, and Leonard all testified that the incident described by Kyle never happened. A rental car receipt proves Ventura could not have been at McP's when many of Kyle's witnesses

---

[207] See Estate Brief 47 (conceding that "a defendant cannot ensure a verdict in his favor merely by asserting a belief in the truth his work.").

[208] ADD-0013-14, n.1 (district court concluding actual malice proved by clear-and-convincing evidence).

50

claim to have seen him. Photographs show that Ventura was not punched in the face. There is no police report or hospital record relating to the alleged assault. And, through their multiple inconsistencies, contradictions, and improbable tales, Kyle and his witnesses were thoroughly discredited.[209]

This case does not involve a media defendant relaying important public information received from a third-party source. Rather, Kyle told a firsthand account of an unambiguous event.[210] Thus, if the incident described did not occur, the only conclusion is that it was knowingly fabricated, *i.e.*, Kyle acted with actual malice. *See, e.g.*, *St. Amant*, 390 U.S. at 732 (evidence of fabrication sufficient to establish actual malice); ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS §5.5.2, at 5-83-84 (4th ed. 2010) ("[I]f the defendant is an eyewitness to an unambiguous event which he or she then misreports, a finding of 'actual malice' may arise from testimony of other witnesses establishing that the event did not happen as described.").

Based on the evidence that both the jury and the district court necessarily found to be credible, as well as the photographs and documentary evidence

---

[209] *Prinzing v. Schwab*, No. A05-398, 2006 WL 538926, at *1 (Minn. Ct. App. Mar. 7, 2006) ("[W]hen a defendant's testimony as to his subjective beliefs simply is not credible, the fact-finder is free to disbelieve the testimony and draw a contrary conclusion.").

[210] ADD-0051 ("Kyle's story does not recount an ambiguous event.").

51

submitted by Ventura, the record clearly and convincingly establishes that Kyle knowingly lied about an incident that simply did not occur. Because an independent review of the record supports the finding of actual malice, the judgment below should be affirmed.

## II. UNJUST ENRICHMENT

### A. The Estate Waived Its State Law and First Amendment Arguments by Failing to Timely Raise Them in the District Court.

"Without an objection and a proper request for relief, [a] matter is waived and will receive no consideration on appeal absent plain error." *McKnight ex rel. Ludwig v. Johnson Controls, Inc*., 36 F.3d 1396, 1407 (8th Cir. 1994). "A party's failure to object to jury instructions results in a waiver of that objection, absent a showing of plain error." *Niemiec v. Union Pac. R.R. Co*., 449 F.3d 854, 857-58 (8th Cir. 2006).

Fed. R. Civ. P. 50(a) permits a motion for judgment as a matter of law at the close of a party's case, but requires that the motion "specify … the law and facts that entitle the movant to judgment." Fed. R. Civ. P. 50(a). Issues not included in a Rule 50(a) motion are waived and cannot be included in a Rule 50(b) motion. *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc*., 439 F.3d 894, 900-01 (8th Cir. 2006). Rule 52(b) permits a motion for amended findings where an action has been tried to an advisory jury. But Rule 52 motions "cannot be used to raise

Appellate Case: 14-3876     Page: 60     Date Filed: 04/27/2015 Entry ID: 4269150

arguments which could have been raised prior to the issuance of judgment."

*Fontenot v. Mesa Petroleum Co*., 791 F.2d 1207, 1220 (5th Cir. 1986).

As explained in the Statement of the Case, Section G, at no time prior to entry of judgment did Kyle or the Estate argue that Ventura's unjust enrichment claim is barred by Minnesota law or the First Amendment.  In fact, the Estate failed to even make a Rule 52(b) motion for amended findings.[211]  Because it did not object or otherwise preserve these arguments for appeal, the Estate cannot raise them for the first time here.[212]

### B. Neither Minnesota Law Nor the First Amendment Bar a Defamation Plaintiff from Seeking Damages for Unjust Enrichment.

#### 1. Ventura's Unjust Enrichment Claim Is Allowed Under Minnesota Law.

Unjust enrichment is an equitable doctrine that provides a remedy where the circumstances are such that it would be unjust for that person to retain a benefit "in the sense that the term unjustly could mean illegally or unlawfully."

*ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc*., 544 N.W.2d 302, 206 (Minn. 1996).  One may recover to prevent unjust enrichment if the "benefit was conferred

---

[211] ADD-0015.

[212] ADD-0016-18 (ruling argument waived); ECF 406 at 3.

unknowingly or unwillingly." *Galante v. Oz, Inc*., 379 N.W.2d 723, 726 (Minn. Ct. App. 1986).

Having failed to make the argument below, the Estate asks this Court to rule that Ventura cannot recover in unjust enrichment because he had no "pre-existing implied or quasi-contractual relationship" with Kyle.  But the Estate has it backwards, because equity implies a contractual obligation to pay where no contract exists, and it is precisely because the parties were not in a contractual relationship that Ventura is entitled to recover in equity.  *See., e.g*., *Acton Const. Co. v. State*, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986).[213]  In fact, had there been a contractual relationship, equitable remedies would have been barred. *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 854 (8th Cir. 2014) ("[E]quitable relief cannot be granted where the rights of the parties are governed by a valid contract.").

Ventura "unknowingly and unwillingly" conferred a benefit on the Estate when Kyle fabricated the story about him and used it to promote book sales.  The benefit was obtained "illegally or unlawfully" through tortious conduct, *i.e.*,

---

[213] The Estate's argument that Ventura may recover only if his name was used in advertising for a commercial product was earlier rejected by the district court.  *See* ADD-0037 ("Kyle also argues that he is entitled to summary judgment because he did not appropriate Ventura's identity for a commercial purpose.  But this argument misses the mark because Ventura is not required to show a commercial purpose.").

defamation. Minnesota law requires nothing more, and the district court did not err.

The Estate also incorrectly argues for the first time that Ventura's unjust enrichment claim is barred by an "adequate" legal remedy.[214] But under Minnesota law, the "mere existence of a possible remedy at law … is not sufficient to warrant denial of equitable relief." *U.S. ex rel. Zissler v. Regents of the Univ. Minn.*, 992 F.Supp. 1097, 1112 (D. Minn. 1998). Instead, the "jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would afford under the same circumstances." *Id.*

Nor are the remedies for defamation and unjust enrichment duplicative because, as the district court ruled, damages for unjust enrichment are measured by the Estate's gain, whereas damages for defamation are a product of the harm to Ventura's reputation.[215] And jury was specifically "instructed… [and] advised—*at Defendants' behest* … that it could *not* award additional damages for unjust enrichment if it found that Plaintiff's 'damages award for defamation … provide[d] him with an adequate remedy.'"[216]

---

[214] ADD-0018-20 (ruling Ventura has no "adequate" legal remedy).

[215] ADD-0019-20, 0039.

[216] ADD-0019.

Furthermore, as the Estate itself concedes, no Minnesota court has ever held that a defendant's profits may be recovered for appropriation.[217]  *See Wagner v. Gallup, Inc.*, 989 F. Supp. 2d 782, 792 (D. Minn. 2003) ("Although the Minnesota Supreme Court has not opined on damages issues in the context of an appropriation claim ... the Restatement notes that a plaintiff who has established invasion of his privacy may recover damages for 'his mental distress.'").  Because the recoverable damages for defamation, appropriation, and unjust enrichment are each unique, and because the two legal remedies do not require the Estate to disgorge its unjust gains, Ventura had no remedy at law—let alone an adequate one.[218]  *See, e.g.*, *WWP, Inc.*, 628 F.3d at 1044 (affirming award of damages for loss to reputation and goodwill, and damages for unjust enrichment).

The Estate points to *Loftness*, 742 F.3d at 854-55 and *United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) for the argument that Ventura's legal remedy is adequate.  But *Loftness* stands only for the proposition that "[e]quitable relief cannot be granted where the rights of the parties are governed by a valid contract." 742 F.3d at 854.  And *Bame* denied equitable relief only because "the government did not seek any relief in equity which it could not obtain under the statutory

---

[217] Estate Brief 57-58.

[218] APP-2289 (Instruction No. 13).

Appellate Case: 14-3876     Page: 64     Date Filed: 04/27/2015 Entry ID: 4269150

claims." 721 F.3d at 1031. Unlike those cases, Ventura had no contract with the Estate, and his claims are not based on the violation of any statutes.

Because Ventura had no remedy at law for recovering the Estate's unlawful gains, the district court correctly awarded damages for unjust enrichment. *See* Erick J. Konopka, *Hey, That's Cheating! The Misuse of the Irreparable Injury Rule as a Shortcut to Preclude Unjust-Enrichment Claims*, 114 Colum. L. Rev. 2045 (2014) (examining "Minnesota case law that has led courts to dismiss unjust enrichment-claims by invoking the irreparable injury rule, and suggest[ing] that the result is not clearly required by precedent").

### 2. Ventura's Unjust Enrichment Claim Is Not Barred by the First Amendment.

The Estate asks the Court declare that the First Amendment bars a claim for unjust enrichment that is premised on false and defamatory speech. This is simply not the case. *See Stock v. Heiner*, 696 F.Supp. 1253, 1262 (D. Minn. 1988) (allowing unjust enrichment claim based on defamatory statements).

First, the district court correctly instructed the jury: "To prevail on this unjust-enrichment claim, Mr. Ventura must have proved his defamation claim."[219] Thus, in order to recover on his claim for unjust enrichment, Ventura was required to overcome the same constitutional hurdles applied to defamation claims

---

[219] APP-2286.

involving public figures. *See Gertz*, 418 U.S. at 349 ("States may not permit recovery of presumed or punitive damages, *at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth*. … It is necessary to restrict defamation plaintiffs *who do not prove knowledge of falsity or reckless disregard for the truth* to compensation for actual injury.") (emphasis added).

Second, the district court was also correct that "[the Estate] is simply wrong to claim the First Amendment requires limiting the damages available for actionable false speech to the plaintiff's loss."[220]  As but one example, states may permit punitive damages against a defendant who publishes a defamatory statement with knowledge that it is false or with reckless disregard for its truth. *Id.* Likewise, "[w]here false claims are made to effect a fraud or secure moneys or other value considerations, … it is well established that the Government may restrict speech without affronting the First Amendment." *United States v. Alvarez*, 132 S.Ct. 2537, 2547-48 (2012) (emphasis added); *State v. Melchert-Dinkel*, 844 N.W.2d 13 (Minn. 2014) (fraud is among the traditional exceptions to First Amendment speech protections).

---

[220] ADD-0020.

Appellate Case: 14-3876     Page: 66     Date Filed: 04/27/2015 Entry ID: 4269150

Here, the jury and district court determined that Kyle published a materially false and defamatory story about Ventura with actual malice. That ruling takes the First Amendment out of the equation. Just as courts may permit punitive damages for knowingly false and defamatory speech, and damages for false claims made to secure money or other considerations, so too may they permit equitable remedies for disgorgement of profits illegally or unlawfully obtained through the same conduct. Neither the Estate, nor Amici, have cited any authority to the contrary.

### C.     The District Court's Findings of Fact on Ventura's Unjust Enrichment Claim Are Not Clearly Erroneous.

The finder of fact is entitled to "sort through the evidence presented at trial and to arrive at what it consider[s] to be the damages caused by the conduct it found to be wrongful." *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1017 (8th Cir. 2001) ("Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount."). The award "does not have to match any particular figure in the evidence as long as the award 'is within the mathematical limitations established by the various witnesses and is otherwise reasonably supported by the evidence as a whole.'" *Id.* (quoting *Carroll v. Pratt*, 76 N.W.2d 693, 697 (Minn. 1956)); *Ruzicka Elec. & Sons, Inc. v. Int'l Bhd. of Elec. Workers, Local 1, AFL-CIO*, 427 F.3d 511, 521 (8th Cir. 2005) ("mathematical precision is not required—proof to a reasonable certainty is

59

sufficient." ); *WWP, Inc.*, 628 F.3d at 1044 ("some uncertainty in damages should not work to bar a plaintiff from recovering from a proved wrongdoer … .").

The Estate challenges the factual basis for Ventura's unjust enrichment claim, arguing that Ventura failed to establish both the fact that Kyle was enriched and the amount of that enrichment. Although Ventura's unjust enrichment claim was tried to an advisory jury, the district court was ultimately responsible for making findings of fact with regard to that claim, and those findings must not be set aside on appeal unless clearly erroneous. *Speer v. City of Wynne, Ark.*, 276 F.3d 980, 984-985 (8th Cir. 2002); Fed. R. Civ. P. 52(a)(6).

The record demonstrates that Kyle and the Estate benefitted from publication of the false and defamatory story about Ventura, because it was that story that immediately thrust the previously unknown Kyle into the national spotlight, and caused his book to rocket to number one on the bestseller lists—for which he received millions in royalties—in just days. Because Ventura was required to prove not only that the story was false, but that it was published with actual malice, as both a matter of law and common sense Kyle "knowingly" received something of value. In fact, very early on in this case, Kyle specifically

60

withdrew any argument that he did not personally benefit from publication of the false and defamatory story.[221]

The record also confirms that the court "received substantial evidence related to Ventura's unjust enrichment claim,"[222] and that the evidence supports the court's decision to adopt the jury's advisory verdict awarding Ventura $1,345,477.25. Specifically, the evidence shows that *American Sniper* was released on January 3, 2012, and unknown first-time author Kyle and his publisher thought it would appeal only to a limited, niche market. On January 4, Kyle identified "Scruff Face" as Ventura in a national broadcast of the *Opie and Anthony* Show. On January 5, Kyle appeared on *The O'Reilly Factor*, where O'Reilly opened by asking about the Ventura story. On January 6—three days after its release—the book went to number 1 on Amazon's best-seller list, and HarperCollins ordered 100,000 reprints. Editor Hubbard responded, "Holy shit," and labeled the Ventura-related publicity "priceless." Publicist Rosenblum characterized the Ventura story as "Hot Hot Hot!!!," and a marketing campaign was developed around the Ventura story and the publicity it was receiving. On January 10, Kyle was went on *Opie & Anthony* to talk about the Ventura story again. By January 22, the book was a *New York Times* number 1 best-seller, and

---

[221] ADD-0038-39; APP-0068-69.

[222] ADD-0001, 0004.

Appellate Case: 14-3876     Page: 69     Date Filed: 04/27/2015 Entry ID: 4269150

the film rights were optioned by Warner Brothers in June of 2012. Hubbard and Rosenblum agreed that the sales figures were not only unexpected, but "astonishing."

Based on this and other evidence presented at trial, the jury and district court reasonably concluded that Kyle's defamatory story about Ventura generated a tremendous amount of attention for the book, and was directly responsible for the book's unexpected success. The Estate counters only that Ventura testified on cross-examination that he could not pin an exact dollar figure on the promotional value of Kyle's defamatory statements. Mathematical precision, however, is not required. *See, e.g.*, *WWP, Inc.*, 628 F.3d at 1044.[223]

Even though it did not provide Ventura with any royalty statements for 2014—ostensibly because those statements had not yet been generated—the Estate nevertheless takes issue with the fact that the $6 million dollar sales figure put in evidence is only an approximation. But Hubbard testified that the book sold approximately 1.5 million copies, and royalty statements through December 2013[224] permit one to calculate that the Estate's earnings at the time of trial were

---

[223] ADD-0052-53 (citing *Jackson v. Reiling*, 249 N.W.2d 896, 897 (Minn. 1977)) ("There is no general test of remote and speculative damages, and such matters should usually be left to the judgment of the trial court.").

[224] AA -0824-35, 0853-63, 0907-19.

approximately $6 million.[225]  There was also evidence that the Estate was paid more than $500,000 from the contract with Warner Brothers.[226]

The Estate also takes issue with an award that approximates 25% of the Estate's book revenue.  But the district court concluded that the jury's "award of $1,345,477.25 was a reasonable portion (approximately 25%) of Chris Kyle's and his Estate's total profits to date and was supported by substantial evidence."  In short, Ventura submitted evidence sufficient for the jury to "arrive at what it consider[ed] to be the damages caused by the conduct it found to be wrongful," and the district court did not clearly err in adopting the jury's verdict as its own.

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING CROSS-EXAMINATION REGARDING EVIDENCE OF INSURANCE.

Finally, the Estate argues that a new trial is necessary because the district court allowed Ventura's counsel to cross-examine two witnesses about Kyle's insurance coverage and then "argue to the jury that insurance would cover an award."[227]  This Court "will not set aside a jury verdict unless the district court clearly and prejudicially abused its discretion in determining whether or not to admit evidence."  *Shaw Group*, 516 F.3d at 1068.  The error "must affect a

---

[225] ADD-0003-04; AA-0660, 0677; APP-2435-48.

[226] ADD-0004.

[227] Estate Brief 68-69.

63

substantial right of the objecting party, and the burden of showing prejudice rests on that party." *ACTONet, Ltd. v. Allou Health & Beauty Care*, 219 F.3d 836, 848 (8th Cir. 2000). "To constitute reversible error, statements made in closing arguments must be plainly unwarranted and clearly injurious." *Burroughs v. Mackie Moving Sys. Corp.*, 690 F.3d 1047, 1051 (8th Cir. 2012).

Kyle's Publishing Agreement was admitted into evidence without any objection from the Estate. At paragraph 6(b)(3), Kyle is specifically named as an additional insured on the publisher's defamation insurance policy.[228] Before Ventura's counsel ever said a word about an insurance policy, therefore, evidence of its existence was already before the jury. And, because the Estate did not object, its argument that the jury should never have been informed of the existence of an insurance policy has been waived.

Subsequently, the district permitted limited inquiry about the existence of insurance to show that HarperCollins employees Hubbard and Rosenblum had a financial motivation to testify and were biased.[229] Even if the Estate had not waived its right to object to this evidence by allowing the Publishing Agreement to be received, admitting it was not an abuse of discretion because, by its express

---

[228] APP-2444.

[229] ADD-0029; APP-1995; *see also* Fed. R. Evid. 411 (evidence of insurance admissible to prove "a witness's bias or prejudice").

Appellate Case: 14-3876     Page: 72     Date Filed: 04/27/2015 Entry ID: 4269150

terms, Fed. R. Evid. 411 *only* prohibits evidence that a person was or was not insured against liability *if* it is offered "to prove whether the person acted negligently or otherwise wrongfully."[230]

But Ventura never sought to introduce evidence that Kyle was insured to "prove" that he "acted negligently or otherwise wrongfully."[231]  Rather, the evidence was admitted to demonstrate that HarperCollins' employees Rosenblum and Hubbard were biased.  *See, e.g.*, *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1301 (8th Cir. 1982) ("[I]t is established that the existence of liability insurance may be used for some purposes, such as showing the possible bias of a witness."); *Higgin v. Hicks Co.*, 756 F.2d 681, 684-85 (8th Cir. 1985) (evidence of liability insurance may be admitted to prove bias or prejudice of a witness).

Despite arguing that insurance evidence can only be admitted to show bias where the witness is employed by the insurer or has some other substantial connection, the Estate has failed to cite a single case that limits Fed. R. Evid. 411 in this way.  And, even if any such a limitation existed, the standard would be met here because Rosenblum and Hubbard have a substantial connection to the insurer. They are employees of the insured and have a definite financial interest in the outcome as well as a duty under the policy to cooperate and assist the defense.

---

[230] Fed. R. Evid. 411.

[231] ADD-0029; AA-0489, 0581-84.

Appellate Case: 14-3876     Page: 73     Date Filed: 04/27/2015 Entry ID: 4269150

They are not, as the Estate presented them, disinterested witnesses, and the jury was entitled to know it.

Nor can the Estate show that cross-examination regarding the insurance policy affected its substantial rights. *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1391 (8th Cir. 1986) ("[T]he admission of improper evidence is harmless error when it does not affect the substantial rights of the complaining party."). Ventura's counsel instead purposefully limited his questions to avoid any argument that evidence of insurance was being offered for any purpose other than to show witness bias.[232]

The Estate also conveniently fails to mention that the primary focus of its defense was a blatant appeal for sympathy.[233] For example, defense counsel engaged in the following exchange with Taya Kyle:

> Q. If the Plaintiff in this lawsuit recovers book proceeds from you as a result of this lawsuit and you have already given that money away … Would you be able to pay the Plaintiff?
>
> A. I see what you're saying. Yeah, I mean, I need to hold onto it to—so that if I had to pay something, that I can still have, you know, money to live on or raise my kids with.[234]

---

[232] APP-1997-98; AA-0659-60.

[233] ADD-0029; AA-0058-78.

[234] APP-0343.

66

That was just one of the many obvious pleas for sympathy, and is a tactic referred to as "poor mouthing."[235]

"The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab." *Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996). Numerous other courts and commentators agree. *See, e.g.*, *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 413 (S.D.N.Y. 2003) ("[C]ourts have allowed evidence of insurance in cases where the insured opens the door to the issue by 'poor mouthing' or where the party's ability to pay damages has been put into issue."); *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1055 (10th Cir. 1983) ("[W]e hold that OKC did 'open the door' to this subject matter, which allowed Whiteley to cross-examine the witness to contradict the evidence of OKC's 'poor boy' status."); 471 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5368 (1st ed. 1980) ("Certainly the latter view [allowing for 'curative admissibility' of liability insurance] is more in accordance with notions of justice … .").

The Estate is also wrong to argue that Ventura's closing argument improperly focused on insurance, because there was no such focus,[236] there was no

---

[235] Additional prejudicial testimony was repeatedly elicited by the Estate's counsel. *See, e.g.*, AA-0413-34.

[236] APP-2236-37.

Appellate Case: 14-3876    Page: 75    Date Filed: 04/27/2015 Entry ID: 4269150

timely objection during closing,[237] and the district court rejected the same argument when it promptly denied the Estate's motion for a mistrial.[238]  In fact, Counsel's one-hour closing argument included only one mention of insurance, and he pointed out only that, "It's hard to believe [Rosenblum's and Hubbard's testimony] that they didn't know about the insurance policy because it's right in Kyle's publishing contract [at] Paragraph 6.B.3. of Exhibit 82."[239] Nothing Ventura's counsel said during closing was "plainly unwarranted and clearly injurious," the district court did not abuse its discretion, and there are no grounds for a new trial.  *Burroughs*, 690 F.3d at 1051.

Because allowing limited cross-examination on the issue of insurance was neither contrary to Rule 411 nor an abuse of discretion, and because the Estate cannot show impairment of a substantial right and, in any event, waived its objection by allowing similar evidence to be admitted earlier in the trial, there are no grounds for a new trial.

## CONCLUSION

For all of the foregoing reasons, this Court should affirm the jury's verdict and district court's judgment in all respects.

---

[237] AA-0671-81.

[238] APP-2266-67.

[239] APP-2237.

Appellate Case: 14-3876    Page: 76    Date Filed: 04/27/2015 Entry ID: 4269150

**HENSON & EFRON, P.A.**

Dated:  April 24, 2015.          By  /s/ *David Bradley Olsen*
                                           David Bradley Olsen (Minn. #197944)
                                           Court J. Anderson (Minn. #331570)
                                           John N. Bisanz, Jr. (Minn. #0389098)
                                           Benjamin J. Hamborg (Minn. #0395401)
                                     220 South Sixth Street, Suite 1800
                                     Minneapolis, Minnesota  55402-4503
                                     Telephone:  612-339-2500
                                     Facsimile:  612-339-6364
                                     ***Attorneys for Plaintiff-Appellee***
                                     ***Jesse Ventura a/k/a James G. Janos***

Appellate Case: 14-3876     Page: 77     Date Filed: 04/27/2015 Entry ID: 4269150

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

       The brief contains 13,737 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

       The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:   April 24, 2015.                    /s/ *David Bradley Olsen*
                                       David Bradley Olsen

Appellate Case: 14-3876    Page: 78    Date Filed: 04/27/2015 Entry ID: 4269150

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that on April 24, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Dated: April 24, 2015.           /s/ *David Bradley Olsen*
                                 David Bradley Olsen

543375.DOCX